# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No.: 9-14-cv-80708 (BB)
Bankruptcy Court Case Nos:
09-36379-PGH
09-36396-PGH
(Jointly Administered)

In re:

PALM BEACH FINANCE PARTNERS, L.P.,
PALM BEACH FINANCE II, L.P.,

Debtor(s).

_____/

THE ASHTON RECOVABLE LIVING TRUST
AND MARIE ASHTON,

                          Appellants,

v.

BARRY E. MUKAMAL, in his capacity
as Liquidating Trustee for the Palm Beach
Finance Partners Liquidating Trust and the
Palm Beach Finance II Liquidating Trust,

                          Appellee.

_____/

### INITIAL BRIEF ON BEHALF OF DEFENDANTS-APPELLANTS
### THE ASHTON REVOCABLE LIVING TRUST AND MARIE ASHTON

BECKER & POLIAKOFF, P.A.
Lisa Castellano, Esq.
311 Park Place, Suite 250
Clearwater, Florida 33759
Telephone: (727) 712-4000
Facsimile: (727) 796-1484
LCastellano@bplegal.com

BECKER & POLIAKOFF LLP
Helen Davis Chaitman
45 Broadway, 8th Floor
New York, New York 10006
Telephone: (212) 599-3322
Facsimile: (212) 557-0295
HChaitman@bplegal.com

*Attorneys for Defendants-Appellants*
*Marie Ashton and the Ashton Revocable Living Trust*

{N0050384 2 }

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT OF JURISDICTION .......................................................................... 1

STATEMENT OF ISSUES PRESENTED ................................................................. 1

STATEMENT OF THE CASE AND THE FACTS ................................................... 3

    A.    THE CLAIMS AGAINST ASHTON ................................................... 3

    B.    THE MEDIATION AND THE ORAL SETTLEMENT ...................... 3

    C.    ACTIONS AFTER THE MEDIATION ............................................. 7

    D.    THE FL RULE 9019 MOTION .......................................................... 11

STANDARD FOR APPELLATE REVIEW ............................................................. 13

SUMMARY OF ARGUMENT .................................................................................. 13

ARGUMENT .............................................................................................................. 14

    I.    The Bankruptcy Court Lacked Constitutional Authority to Enter the Orders Under *Stern v. Marshall*, 131 S. Ct. 2594 (2011) ........................... 14

    II.    The Bankruptcy Court Misconstrued the Doctrine of Judicial Estoppel ..................... 17

    III.    The Bankruptcy Court Erred in Holding That the MCMA Does Not Require a Mediated Settlement Agreement to be in Writing Signed by the Parties .......................................................................................... 19

    IV.    Even if Oral Settlements Are Enforceable Under the MCMA, the Bankruptcy Court Erred in Enforcing the Oral Settlement ........................... 20

    V.    The Bankruptcy Court Erred in Holding that Appleby and Farfante Could Bind Ashton to a Settlement to Which She Did Not Agree .............................. 24

    VI.    The Bankruptcy Court Erred in Holding That Ashton's Understanding of the Scope of the Release Was a Unilateral Mistake that Does Not Justify Rescission of the Oral Agreement ..................................................... 26

CONCLUSION ............................................................................................................ 26

REQUEST FOR ORAL ARGUMENT .................................................................... 27

CERTIFICATE OF SERVICE  ..................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barry v. Barry*, 172 F.3d 1011, 1015 (8th Cir. 1999) ................................................................24

*In re Bennett*, 154 B.R. 126 (Bankr. N.D.N.Y. 1992) ................................................................15

*In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013) ................................................................16

*Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002) ................................................................17

*City of Delray Beach v. Keiser*, 699 So.2d 855 (Fla. 4th DCA 1997) ................................................................14

*Dataserv Equipment v. Technology Finance Leasing Corp.*, 364 N.W.2d 838 (Minn. Ct. App. 1985) ................................................................21

*Executive Benefits Insurance Agency v. Arkison (In re Bellingham Ins. Agency)*, No. 12-200, ___ S. Ct. ___, 2014 WL 2560461 (June 9, 2014) ................................................13, 15

*Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013) ................................16, 18

*In re Fundamental Long Term Care, Inc.*, 501 B.R. 770 (Bankr. M.D. Fla. 2013) ................................16

*Gran v. City of St. Paul*, 274 Minn. 220 (Minn. Sup. Ct. 1966) ................................................................24

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ................................................................14, 16

*Haghighi v. Russian American Broadcasting Co.*, 945 F. Supp. 1233 (D. Minn. 1996) ................................................................19, 20

*Haghighi v. Russian-American Broadcasting Co.*, 577 N.W.2d 927 (Minn. Sup. Ct. 1998) ................................................................19, 20

*Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925 (Minn. Ct. App. 1992) ................................20, 22

*Horace Mann Ins. Co. v. Ferguson*, 2008 WL 2246142 (Minn. Ct. App. June 3, 2008) ................................................................22

*Lain v. Erickson (In re Erickson Ret. Cmty, LLC)*, 2012 WL 1999493 (D. Md. June 1, 2012) ................................................................15

*Langenkamp v. Culp*, 498 U.S. 42 (1990) ................................................................15

*Luigino's Inc. v. Societes des Produits Nestle S.A.*, 2005 WL 735919 (D. Minn. March 30, 2005) ........................................................................................................21

*Massee v. Gibbs*, 210 N.W. 872 (Minn. Sup. Ct. 1926) ................................................21

*Mastec, Inc. v. Cue*, 994 So.2d 494 (Fla. 3d DCA 2008) .............................................14

*Moga v. Shorewater Advisors, LLC,* 2009 WL 982237 (Minn. Ct. App. Apr. 14, 2009) ................................................................................................................................22

*In re Mouttet*, 493 B.R. 640 (Bankr. S.D. Fla. 2013) ...................................................17

*Northway v. Whiting*, 436 N.W.2d 796 (Minn. Ct. App. 1989) ....................................20

*Reese v. Tingley Const.*, 177 P.3d 605 (Utah Sup. Ct. 2008) .......................................14

*Regions Treatment Center, LLC v. New Stream Real Estate, LLC,* 2013 WL 4028148 (D. Minn. Aug. 7, 2013) ...............................................................................21

*Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269 (11th Cir. 2010)...................................17

*Schumann v. Northtown Ins. Agency, Inc.*, 452 N.W.2d 482 (Minn. Ct. App. 1990)........24, 25, 26

*Schwartz v. Adamson*, 1999 WL 170676 (Minn. Ct. App. March 30, 1999)................................20

*Staley Manufacturing Co. v. Northern Cooperatives, Inc.*, 168 F.2d 892 (8th Cir. 1948) ................................................................................................................................21

*State Dept. of Transp. v. Plunske*, 267 So.2d 337 (Fla. 4th DCA 1972) ......................24

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) ............................................................. *passim*

*In re Sublett*, 895 F.2d 1381 (11th Cir. 1990)..............................................................13

*Vernon v. Acton*, 732 N.E.2d 805 (Ind. Sup. Ct. 2000) ..............................................13

*Vo v. Honeywell, Inc.*, 1998 WL 15909 (Minn. Ct. App. Jan. 20, 1998)................................19, 20

*Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012) ........................................................16

*Wellness Intern. Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013) ................................16, 18

*Willingboro Mall, Ltd. v. 240/242 Frankin Ave., L.L.C.*, 215 N.J. 242 (N.J. Sup. Ct. 2013) .......................................................................................................... 13-14

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985).....................14

**Statutes & Rules**

28 U.S.C. § 157(b) ........................................................................................12

28 U.S.C. § 1334(b) ......................................................................................12

Fla. R. Civ. P. 1.730(b) ................................................................................14

S.D. Fla. L. R. 87.4(f) ..................................................................................27

Minn. Stat. § 481.08 .....................................................................................24

Minn. Stat. § 572.33(4) ............................................................................14, 19

Minnesota Civil Mediation Act ............................................................. *passim*

**Other Authorities**

7A C.J.S. ATTORNEY & CLIENT § 230 .........................................................24

1 ALT. DISP. RESOL. § 5:33 (3d ed.).............................................................19

## STATEMENT OF JURISDICTION

Appellants The Ashton Revocable Living Trust and Marie Ashton (together "Ashton") appeal the bankruptcy court's March 6, 2014 Order containing Findings of Fact and Conclusions of Law on Motion to Approve Settlement (the "Decision") and the April 3, 2014 Order Granting Liquidating Trustee's Motion to Approve Settlement with Ashton and Payment of Contingency Fee (the "FL Rule 9019 Order") (together, the "Orders").  The Orders are final for purposes of § 158(a) because they fully resolved the bankruptcy litigation against Ashton brought by Barry M. Mukamal, liquidating trustee (the "Trustee") for the Palm Beach Finance Partners Liquidating Trust and the Palm Beach Finance Partners II Liquidating Trust (the "Funds").

## STATEMENT OF ISSUES PRESENTED

The issues presented in this appeal are:

1.      Did the bankruptcy court have authority under Article III of the Constitution and *Stern v. Marshall*, 131 S. Ct. 2594 (2011), to enter the Orders when Ashton had not voluntarily submitted to the bankruptcy court's jurisdiction and had not joined issue with the Trustee.

2.      Did the bankruptcy court err in holding that Ashton was bound by an oral settlement agreement in view of the following indisputable facts:

a.      Even though Ashton had not submitted to the bankruptcy court's jurisdiction, the bankruptcy court ordered Ashton to participate in a mediation in Minnesota.

b.      The Minnesota mediator required the parties to sign a mediation agreement that provided that the mediation was being conducted pursuant to the Minnesota Civil Mediation Act, under which no settlement agreement is binding unless it is in writing and signed by the parties.

c.      All parties signed the mediation agreement and no one asserted at the mediation that the provision requiring a written settlement agreement was not applicable.

d.      Both Ashton and her counsel testified that they understood that no settlement would be binding unless it was in writing signed by the parties.

e.      At the mediation, Ashton orally agreed to pay $225,000 to settle the Trustee's claims based upon the condition that she would receive a "global" release and be subject to no further litigation as a result of the transactions alleged in the complaint.

f.      Immediately upon seeing the Trustee's proposed written settlement agreement, Ashton informed her counsel that the agreement was not consistent with the oral settlement because it did not contain a "global" release; thus, Ashton was not receiving the benefit for her payment of $225,000 for which she had bargained at the mediation.

g.      Ashton's counsel recognized that there had not been a meeting of the minds at the mediation.

h.      Ashton demanded either a "global" release or an indemnification from the Trustee against any further litigation arising out of the events that gave rise to the Trustee's suit against her.  The Trustee refused to provide Ashton with either.  As a result, Ashton refused to sign the proposed settlement agreement.

3.      Did the bankruptcy court misconstrue the doctrine of judicial estoppel in holding that Ashton was judicially estopped from arguing that she was not bound by an oral settlement agreement when Ashton had never asserted a position in court on which she had prevailed and then taken an opposite position?

4.      Did the bankruptcy court err in holding that Ashton's counsel had the power to bind Ashton to an oral settlement agreement when both Ashton and her counsel testified that counsel had no such power and counsel testified that there had been no meeting of the minds at the mediation?

5.      Did the bankruptcy court err in holding that Ashton's understanding of the scope of the release to be provided in the settlement agreement was a unilateral mistake when all parties had signed a mediation agreement that required a written settlement agreement to be signed by the parties, and Ashton's counsel testified that there had clearly not been a meeting of the minds at the mediation?

## STATEMENT OF THE CASE AND THE FACTS

### A.      THE CLAIMS AGAINST ASHTON

On November 27, 2011, the Trustee commenced an action against Ashton to recover approximately $858,000 in transfers that Ashton received from Metro Gem, Inc. ("MetroGem") in partial satisfaction of MetroGem's contractual obligations to Ashton under various promissory notes.  (Appellants' Appendix ("AA") at 11-12.)  The PCI Trustee never brought any claim against Ashton (AA259:10-11) but entered into an agreement with the Trustee to share recoveries from parties such as Ashton. (AA23.)[1]

### B.      THE MEDIATION AND THE ORAL SETTLEMENT

Pursuant to the bankruptcy court's November 29, 2011 order setting filing and disclosure requirements for pretrial and trial (the "Initial Pretrial Order"), Ashton, the PCI Trustee, and the Trustee were ordered to participate in mediation on August 21, 2012 in the office of Justice Gilbert in Minnesota.  (AA13.)  The mediation occurred before issue was joined and without Ashton having submitted to the bankruptcy court's jurisdiction.  Ashton was represented at the mediation by Keith T. Appleby ("Appleby") of the law firm of Fowler White Boggs (the "Fowler Firm").  (AA260:4-8.)  Daniel Rosen ("Rosen"), attended the mediation on behalf of the Trustee and Josiah Lamb ("Lamb"), attended on behalf of the PCI Trustee.  (AA768.)

---

[1] By agreement between the trustees, the PCI Trustee receives 60% of any recovery by the Trustee in the adversary proceedings he instituted against people who loaned money to MetroGem; the Trustee receives 40%. (AA27.)

The parties executed a two-page mediation agreement that governed the mediation (the "Mediation Agreement"). (AA316:16-317:3, 317:8-10, 764.)   The Mediation Agreement contained a provision that explicitly referenced the Minnesota Civil Mediation Act (the "MCMA") and set forth certain requirements under the MCMA (the "MCMA Provision"):

> Minnesota Civil Mediation Act. Pursuant to the requirements of the Minnesota Civil Mediation Act, the mediator hereby advised the parties that: (a) the mediator has no duty to protect the parties' interest or provided [*sic*] them with information about their legal rights; (b) signing **a mediated settlement agreement** may adversely affect the parties' legal rights; (c) the parties should consult an attorney before signing **a mediated settlement agreement** if they are uncertain of their rights; and (d) **a written mediated settlement agreement** is not binding unless it contains provisions that it is binding and a provision stating substantially that the parties were advised in writing of (a) through (c) above.

(AA765) (emphasis added.)

Notwithstanding the explicit references to the requirement of a written mediated settlement agreement, counsel for the Trustee and for the PCI Trustee both testified, incredibly, that there was no requirement that the parties enter into a written settlement agreement to be bound. (AA276:21-25, 310:14-311:2, 318:23-319:1.)

Appleby's testimony flatly contradicted the testimony of Rosen and Lamb.  He testified that he understood that only a written agreement executed by all parties would bind Ashton "[b]ecause very specifically the Mediation Agreement said that no agreement would be binding unless it was signed by all parties."  (AA157:7-9.)  Indeed, Appleby testified that, at the mediation, the parties discussed the fact that there would be a written settlement agreement setting forth the terms of the settlement that would be executed by the parties and submitted to the Minnesota bankruptcy court and the Florida bankruptcy court for approval.  (AA161-62.)  Those discussions are consistent with the conversations that Appleby testified that he had with the Trustee's attorney, Jessica Wasserstrom, on "several occasions" after the mediation that confirmed the parties'

mutual understanding that a settlement would have to be in writing and approved by the Minnesota bankruptcy court and the Florida bankruptcy court to be effective.  (AA164.)

Although Rosen testified that he thought a signed written agreement was not necessary to have an enforceable settlement agreement (AA264:16-19), Appleby, who represented other parties in mediations with the Trustee, testified that Rosen's testimony was inconsistent with the Trustee's conduct in other mediations where the Trustee refused to recognize as binding oral agreements reached at mediations.  (AA157:10-158:2.)

Ashton testified that Appleby told her "many times" at the mediation that an oral agreement reached at mediation would not be binding until there was a written agreement that everyone reviewed and signed.  (AA372:21-25.)  Based on Appleby's advice and her own interpretation of the Mediation Agreement, Ashton understood that only a signed executed agreement would be binding.  (*Id.*; AA371:23-372:9, 373:4-10.)  The Trustee's counsel at no point informed either Ashton or Appleby to the contrary.  (AA319:2-5.)

Inexplicably in the face of the Mediation Agreement that expressly required a writing, Lamb and Rosen both testified that the MCMA did not apply to the mediation and that the Mediation Agreement did not require a written agreement.  (AA260:22-261:2, 262:1-5, 264:12-19, 310:14-19, 315:9-14.)  Yet, they both acknowledged that they signed the Mediation Agreement for numerous defendants in other adversary proceedings they had brought (AA317:22-318:3) and Rosen further admitted that he never told Ashton or Appleby that the MCMA does not apply and that any purported oral agreement is enforceable (AA318:18-319:2-5).

At the mediation, Ashton was concerned about future litigation from other parties in connection with her loans to MetroGem.  She refused to agree to a settlement unless she was assured that there would be no further litigation against her arising out of those loans.  (AA364:13-20, 143-144,147:5-13.)  For that reason, in exchange for the enormous sum of $225,000, she insisted

on a "global" release that would protect her against any further litigation arising out of her loans to MetroGem.  (AA359:15-23.)  The parties reached an oral "global" settlement agreement (the "Oral Settlement") at the mediation (AA396:1-13) pursuant to which Ashton understood that she would be protected against any further litigation.  (AA363:23-365:1.)  Rosen and Lamb claimed that the "global" release Ashton was to receive would protect her only against suit from the Trustee and the PCI Trustee.[2]

Appleby testified that the term "global" was used by Ashton and Appleby.  (AA174-175.) Ashton's understanding of a "global" release was that she would receive a release for all possible claims that could be raised by any person against her in connection with her loans to MetroGem.  (AA249:10-250:4, 359:15-20.)  It was not explained to her at the mediation that the term "global" meant only that she would receive a release from the Trustee and the PCI Trustee.  (AA360:7-9.)  In fact, there was no discussion at the mediation about the scope of the release other than that it would be a "global" release and that Ashton would have no exposure and would be putting this entire issue behind her.  (AA359:15-23.)

It is undisputed that, throughout the mediation, Lamb and Rosen were in a different room from Ashton and Appleby and that there was no conversation between Ashton and Lamb and Rosen, except for an exchange of pleasantries at the end of the mediation.  (AA264:5-11, 315:1-8.)  However, Lamb and Rosen testified that, at one point during the mediation, Appleby came into their room to discuss Ashton's exposure to other suits and the possibility of obtaining third-party releases.  (AA262:12-263:8, 312:10-313:20.)  Appleby has a different recollection.  To the best of his recollection, he did not have any conversation with either Rosen or Lamb at the medi-

---

[2] It is important for the Court to recognize that the complaint filed against Ashton by the Trustee fails to state a claim upon which relief can be granted.  Indeed, the bankruptcy court has issued an order dismissing the Trustee's identical complaints against other defendants for failure to state a claim.  *See e.g., Mukamal v. Cosmos Inc.*, Case No. No. 11-02970 (PGH), ECF No. 59 (Bankr. S.D. Fla.).  The Trustee then filed amended complaints, which were again dismissed for failure to state a claim.  *See e.g., Cosmos*, ECF No. 77.  The only party with standing to sue Ashton is the receiver for MetroGem, who has refused to give Ashton a release.  (AA367:18-368:8.)

ation regarding the scope of Ashton's release.  (AA177.)  In fact, he testified emphatically that the first time he realized there was an issue as to the scope of the release was after the mediation when Ashton contacted him about the insufficiency of the release contained in the proposed written settlement agreement (the "Draft Agreement").  (A149, 156a-156b, 163.)  Consistent with Appleby's recollection of events, Ashton confirmed that Appleby did not leave her at all during the mediation.  (AA376:16-377:1.)  In any event, no evidence was presented that Ashton had knowledge of any such alleged conversation, even if it took place.  (AA377:2-6.)

## C.    ACTIONS AFTER THE MEDIATION

On August 22, 2012, Wasserstrom sent to Appleby the Draft Agreement. (AA54.)  On September 4, 2012, Appleby transmitted a redline of the Draft Agreement to Wasserstrom that contained a proposed revision to the date of payment.  (AA64.)  The transmittal email did not indicate that the proposed revisions were Appleby's only changes and, at the time the email was sent, Ashton had not seen the Draft Agreement.

Appleby did not forward the Draft Agreement to Ashton until October 12, 2012.  (AA76, 362:24-363:2.)  Upon receipt, Ashton immediately recognized that it did not contain the "global" release she expected.  (AA363:23-364:2.)  Ashton understood that the "global" release she agreed to would indemnify her from any future lawsuits in connection with the MetroGem loans but the Draft Agreement provided releases only from the Trustee and the PCI Trustee. (AA364:11-23.)  Ashton was very disturbed by this inconsistency with what she believed the parties had agreed to and she immediately notified Appleby of her position.  (AA363-364.)

Appleby testified that Ashton immediately informed him that the Draft Agreement was unacceptable because it did not contain the "global release" that she had been promised. (AA143, 163.)  As Appleby further explained, as soon as Ashton reviewed the Draft Agreement,

it became "apparent" that her "understanding clearly was global meant anyone, anywhere, any-how." (AA163.)

Ashton asked Appleby several times to communicate her position to Wasserstrom and to obtain an indemnification provision to protect her from any further lawsuits in connection with the MetroGem loans. (AA366:23- 367:4.) Appleby testified that he informed Wasserstrom that Ashton could not sign the Draft Agreement absent a "global" release. (AA146:3-25, 150:9-21, 151:7-20, 170:25-171:9.) Wasserstrom denied that Appleby informed her that Ashton had objected to the Draft Agreement. (AA344:3-6, 345:17-346:4, 346:12-14.) However, Wasserstrom did not send a single email to Appleby after October 12, 2012 demanding that Ashton sign the Draft Agreement and she offered no explanation for her failure to do so.

After the initial conversation with Appleby on October 12, 2012 in which Ashton expressed her concerns about the release, she also tried to resolve the issue herself. She called Justice Gilbert's office to try to set up a follow-up mediation session and sought other attorneys to assist her with obtaining a "global" release. (AA365:12-23.) While Ashton found an attorney who represented that there was a "strong chance" that he would be able to have the indemnification clause included in the Draft Agreement, Ashton did not retain him because Appleby told her that he was working with Wasserstrom to revise the release language in the Draft Agreement. (AA365:18-366:15.) Ashton also contacted MetroGem's receiver, Gary Hansen, in an effort to obtain a release of MetroGem's claims. (AA367:18-25.) Hansen refused to give Ashton a release. (AA368:1-2.)

Appleby testified that, in addition to notifying Wasserstrom that Ashton would not sign the Draft Agreement absent a "global" release, on or about November 20, 2012, he also had a conversation with Lamb in which he advised him that Ashton would not sign the Draft Agreement because there was no meeting of the minds. (AA151-52, 166-69.) Lamb denied that Ap-

pleby told him that Ashton refused to proceed with the settlement, although he admitted having a phone call with Appleby.  (AA292:15-293:2, 301:25-302:3, 303:4-22.)

Appleby left the Fowler Firm on November 26, 2012.  Ashton's representation was assumed by Darren Farfante, Esq. ("Farfante") of the Fowler Firm.  (AA142 5:19-22.)

On November 27, 2012, one week after Appleby's phone call with Lamb in which, according to Appleby, he told Lamb that Ashton would not sign the Draft Agreement, Lamb submitted to the Minnesota bankruptcy court a motion on behalf of the PCI Trustee to approve multiple settlements, including the one purportedly reached with Ashton (the "MN Rule 9019 Motion").  (AA692.)  In the MN Rule 9019 Motion, which was signed by Lamb, the PCI Trustee represented to the court that he had settled with Ashton pursuant to a written Joint Stipulation of Settlement.  (AA692 ¶ 30.)  He wrote that the "Metro Gem Subsequent Transferees [including Ashton] who have settled the [PCI] Trustee and the Palm Beach Trustee claims executed Stipulations; a representative example of which is attached as Exhibit 4. The form Stipulation is substantially the same for all settling Metro Gem Subsequent Transferees with the claims. . . ."  (*Id.* at ¶ 32.)  At the Ashton evidentiary hearing, Lamb first denied that he had represented to the Minnesota bankruptcy court that Ashton had entered into a written settlement agreement.  When he was confronted with documentary evidence of his false statement to the court (AA293:13-295:4), he then admitted that his representation was false and that the PCI Trustee allowed the Minnesota bankruptcy court to enter an order affirming the Oral Settlement without bringing that misstatement of fact to the court's attention on the return date of the MN Rule 9019 Motion, despite the PCI Trustee's knowledge that no Joint Stipulation of Settlement was executed.  (AA292:20-296-19.)

Also, in Lamb's phone call with Appleby just one week before he filed the MN Rule 9019 Motion, he did not inform Appleby that he was going to file a motion seeking approval of

the Oral Settlement or the Draft Agreement.  Appleby had no knowledge that the MN Rule 9019 Motion was filed until after an order approving the motion was entered.  Appleby testified that Lamb filed the MN Rule 9019 Motion without advising him of his intent to do so and notwithstanding his recently obtained knowledge from Appleby that Ashton was not going to sign the Draft Settlement since the parties had no meeting of the minds on the scope of the release. (AA167-168.)

Farfante, who assumed Ashton's representation after Appleby left the Fowler Firm, also had no recollection of seeing the MN Rule 9019 Motion.  (AA154.)  Lamb did not contact Farfante to advise him that he incorrectly represented to the Minnesota bankruptcy court that Ashton signed a settlement agreement when in fact Ashton did not.  (AA299:9-15.)  It is undisputed that Ashton did not learn of the MN Rule 9019 Motion until 2013.  (AA378:16-379:1.)

One day before the PCI Trustee filed the MN Rule 9019 Motion, the Trustee filed a status report and proposed agenda for pretrial conference hearings set for November 29, 2012 (the "Status Report").  (AA77.)  In the Status Report, the Trustee's counsel represented that Ashton's case was "Settled (9019 not yet filed)" (AA85) and proposed that, in the Ashton adversary, and like matters that have settled but where motion to approve settlement has not yet been filed, the bankruptcy court "reset[] the pretrial conference to 90 days from November 29, 2012 and suspend[] any pretrial deadlines or disclosure requirements during such time period." (AA78.)

Wasserstrom spoke to Appleby and Farfante before November 29, 2012 regarding the Trustee's intentions with respect to moving forward with the actions such as Ashton's. (AA350:22-351:5.)  She assured Appleby and Farfante that the pretrial hearing would simply be carried without substantive arguments relating to any specific adversary proceeding.  (AA178, 180, 153a, 761.)  In light of their conversations with Wasserstrom, neither Appleby nor Farfante attended the November 29 hearing. (AA153a, 179.)

On November 27, 2013, Farfante wrote to Ashton advising her that it was his understanding that the Trustee's counsel was going to adjourn the November 29, 2013 hearing.  (AA761.) The letter also informed Ashton – for the first time – that Appleby was no longer with the Fowler Firm.  (*Id.*, AA369:15-370:21.)  Shortly after receiving this letter, Ashton contacted Farfante to express to him her concerns about the release in the Draft Agreement.  (AA370:25-371:13.)

At the November 29, 2013 hearing, the bankruptcy court, *sua sponte*, directed entry of an order dismissing the Ashton adversary proceeding as settled based on the false information that the parties reached a settlement (the "Dismissal Order").  (AA770.)  Farfante wrote to Ashton on December 7, 2012 acknowledging her expressed concerns of future liability in connection with the MetroGem loans and informing her that the bankruptcy court entered the Dismissal Order that required filing of a motion to approve the settlement to be filed within 30 days of December 3, 2012.  (AA762-63.)  Based on Farfante's December 7, 2012 letter, Ashton understood that she had 30 days from December 3 to agree to the Draft Agreement in its then form.  (AA375:4-24.) In late December 2012, Ashton retained Helen Davis Chaitman of Becker & Poliakoff LLP. (AA375:25-376:2.)  After the mediation and before October 12, 2012 – when Ashton first received the Draft Agreement – Ms. Chaitman did not advise Ashton that she should not execute the Draft Agreement.  (AA386:2-24.)

## D.    THE FL RULE 9019 MOTION

On February 1, 2013, the Trustee filed a motion to approve the settlement with Ashton and for payment of contingency fee (the "FL Rule 9019 Motion") (AA109), which Ashton timely opposed.  (AA133.)  On April 16, 2013, the bankruptcy court held a preliminary hearing on the FL Rule 9019 Motion at which time the matter was scheduled for an evidentiary hearing.  On December 5, 2013, the bankruptcy court conducted an evidentiary hearing and instructed parties to

submit proposed findings of fact and conclusions of law.  The parties timely submitted proposed findings of fact and conclusions of law.

On March 6, 2014 the bankruptcy court entered the Decision, finding that the parties entered into an enforceable settlement agreement and scheduling a hearing on the FL Rule 9019 Motion.  (AA513.)  The bankruptcy court concluded that it had jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b).  (AA485.)  It held that the doctrine of judicial estoppel barred Ashton from disputing that an enforceable settlement agreement exists because her objection to the settlement agreement was not raised earlier.  (AA485-487.)

The bankruptcy court also considered whether an enforceable settlement agreement was reached and held, purportedly applying Minnesota law, that the MCMA Provision set forth in the Mediation Agreement was inapplicable because the Trustee was trying to enforce an oral settlement agreement, not a written one.  (AA491-493.)  After concluding that the Oral Settlement is enforceable under the MCMA, the bankruptcy court concluded that the parties had a meeting of the minds as to the terms of the Oral Settlement despite the testimony of both Ashton and Appleby that there had not been a meeting of the minds because Ashton understood that she would be protected from any further litigation by the settlement agreement.  (AA494-500.)

The bankruptcy court then concluded that, even if there was no meeting of the minds as to the terms of the settlement between Ashton and the Trustee, the actions of Appleby and Farfante bound Ashton to the Oral Settlement.  (AA500-503.)  The court reasoned that Appleby agreed to the terms of the settlement at the mediation and that the emails between Appleby and Farfante and Wasserstrom after the mediation ratified the Oral Settlement.  (AA500.)  The court further concluded that, notwithstanding the fact that Appleby had no express authority to enter into the Oral Settlement (AA503), the Oral Settlement was binding on Ashton under the principle of implied acceptance.  (AA501.)  The court (a) ignored the testimony of both Appleby and Ashton

that Ashton's refusal to proceed with the Draft Settlement was communicated to Wasserstrom and Lamb and (b) ignored the fact that Wasserstrom never inquired of Appleby or Farfante after October 12, 2012 as to why Ashton had not signed the Draft Settlement.

The bankruptcy court rejected Ashton's argument that, setting aside the issue of whether an oral settlement is *per se* unenforceable under the MCMA, the Oral Settlement is unenforceable because the parties did not intend to be bound until a written agreement was executed.  The court held that, although there was an understanding that the Oral Settlement would eventually be reduced to a written agreement, there was no evidence that the parties intended the execution of a written agreement to be a condition precedent to enforceability of the settlement.  (AA504-509.)

Pursuant to the Decision, on April 1, 2014, the bankruptcy court conducted a hearing on the FL Rule 9019 Motion and entered the FL Rule 9019 Order approving the Oral Settlement. (AA514.)  Ashton timely appealed the Decision and the FL Rule 9019 Order.  (AA513a, 517.)

## STANDARD FOR APPELLATE REVIEW

Where, as here, the bankruptcy court had no Article III jurisdiction, its findings of fact are subject to *de novo* review.  *See Executive Benefits Insurance Agency v. Arkison (In re Bellingham Ins. Agency)*, No. 12-200, __ S. Ct. __, 2014 WL 2560461 (June 9, 2014).  The bankruptcy court's conclusions of law are also subject to *de novo* review.  *See In re Sublett*, 895 F.2d 1381, 1384 (11th Cir. 1990).

## SUMMARY OF ARGUMENT

Both Minnesota and Florida require that a mediated settlement be evidenced by a written settlement agreement signed by the parties.  The bankruptcy court flatly ignored this law, which is grounded upon sound public policy.  As the New Jersey Supreme Court explained in *Willingboro Mall, Ltd. v. 240/242 Frankin Ave., L.L.C.*, a mediated settlement agreement must be in writing so as to assure that there will not be "a new round of litigation" over the terms of the set-

tlement. *See* 215 N.J. 242, 263 (N.J. Sup. Ct. 2013); *see also Reese v. Tingley Const.*, 177 P.3d 605, 610 (Utah Sup. Ct. 2008) ("A writing requirement . . . encourages parties to prepare a comprehensive, final settlement agreement free from misunderstandings and ambiguities."); *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 83 (2d Cir. 1985) ("Where, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation."); *Vernon v. Acton*, 732 N.E.2d 805, 810 (Ind. Sup. Ct. 2000) ("Requiring written agreements, signed by the parties, is more likely to maintain mediation as a viable avenue for clear and enduring dispute resolution rather than one leading to further uncertainty and conflict.").

The numerous errors made by the bankruptcy court, both in its factual findings and its legal conclusions, demonstrate the reason why certain states, including Minnesota and Florida, have provided, by statute, that mediated settlements are not enforceable unless they are in writing, signed by the parties. *See* Minn. Stat. § 572.33(4); *see* Fla. R. Civ. P. 1.730(b); *see also City of Delray Beach v. Keiser*, 699 So.2d 855, 856 (Fla. 4th DCA 1997); *Mastec, Inc. v. Cue*, 994 So. 2d 494, 495 (Fla. 3d DCA 2008).

## <u>ARGUMENT</u>

### I.    <u>The Bankruptcy Court Lacked Constitutional Authority to Enter the Orders Under *Stern v. Marshall*, 131 S. Ct. 2594 (2011)</u>

A bankruptcy court does not have constitutional authority to adjudicate avoidance actions against a non-creditor.  In *Granfinanciera, S.A. v. Nordberg*, while primarily examining a non-creditor's right to a jury trial on fraudulent conveyance claims, the Supreme Court specifically stated that fraudulent conveyance actions are akin to common law claims that must be adjudicated by an Article III court.  *See* 492 U.S. 33, 55-56 (1989).  While the law is arguably different for

a defendant who voluntarily submits to the bankruptcy court's jurisdiction by filing a proof of claim, Ashton did not file a proof of claim in the Florida bankruptcy case. *See In re Bennett*, 154 B.R. 126, 133 (Bankr. N.D.N.Y. 1992) (noting that by filing claim against bankruptcy estate, claimant submits itself to equitable jurisdiction of bankruptcy court) (citing *Langenkamp v. Culp*, 498 U.S. 42, 43-45 (1990)).

In discussing its 1989 *Granfinanciera* decision, the *Stern* Court reaffirmed that – at least as to a non-creditor – fraudulent conveyance claims must be adjudicated by an Article III court. *See* 131 S. Ct. at 2614; *see also Lain v. Erickson (In re Erickson Ret. Cmty, LLC),* 2012 WL 1999493, *3 (D. Md. June 1, 2012) ("*Stern* and *Granfinanciera* compel the conclusion that fraudulent conveyance claims must be finally decided by Article III courts, not Bankruptcy Courts.") (footnote omitted)).  If there was any uncertainly, the Supreme Court recently made clear in *In re Bellingham Ins. Agency,* that a fraudulent transfer claim is a "*Stern* type" claim that cannot constitutionally be finally determined by a bankruptcy court, which can only issue proposed findings of fact and conclusions of law to be reviewed *de novo* by the district court.  *See* 2014 WL 2560461 at *3.  Accordingly, the bankruptcy court lacked constitutional authority to enter the Decision and the FL Rule 9019 Order.

The Trustee may argue that *Stern* does not impact the bankruptcy court's authority to enter the Decision and the FL Rule 9019 Order because they involve approval of a settlement of a claim, not a binding judgment on the merits of a claim.  That distinction is irrelevant where, as here, the enforceability of the settlement was in dispute.  The Decision, in which the bankruptcy court erroneously enforced the Draft Settlement, the validity of which Ashton contested, is effectively a final order disposing of the Trustee's fraudulent transfer claims.  The bankruptcy court exercised judicial power beyond its jurisdiction in purporting to enter judgment against Ashton for $225,000.

The Trustee may also argue that Ashton consented to the bankruptcy court's jurisdiction by litigating before the bankruptcy court. Of course, if Ashton had not participated, a default judgment would have been entered against her. Moreover, it is fundamental that, where Article III jurisdiction is lacking, the parties cannot confer such jurisdiction upon the court. *See In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013); *Waldman v. Stone*, 698 F.3d 910, 918 (6th Cir. 2012); *Wellness Intern. Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013).

The decision in *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770 (Bankr. M.D. Fla. 2013), where the court held that parties can consent to the bankruptcy court's entry of a final order on a "*Stern*" type" claim, is incorrect and a violation of Article III of the Constitution. As numerous courts that have considered this issue have recognized, parties by their conduct cannot confer Article III jurisdiction. *See Wellness Intern. Network, Ltd.*, 727 F.3d at 768-69 (party cannot cure absence of federal subject-matter jurisdiction beyond limits imposed by Article III by consent or waiver because the limitations operate as "an inseparable element of separation of powers by protecting the judicial branch from encroachment by the political branches."); *accord Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313, 320 n.3 (5th Cir. 2013). This Court should follow the majority view that a litigant cannot waive an Article III objection to a bankruptcy court's lack of constitutional authority to enter a final order and hold that the bankruptcy court lacked constitutional authority to enter the Decision and the FL Rule 9019 Order.

However, even if this Court determines that Article III's guarantee of an impartial and independent federal adjudication is subject to the notions of waiver and consent, Ashton did not consent to the adjudication by the bankruptcy court and consent cannot be inferred from her conduct during the course of this litigation. Ashton did not file a proof of claim in the bankruptcy

court.  Nor did she submit to the court's jurisdiction by filing an answer to the complaint.  In-stead, she simply participated to prevent the entry of an unjust default judgment against her.[3]

## II.    The Bankruptcy Court Misconstrued the Doctrine of Judicial Estoppel

The bankruptcy court held that Ashton was judicially estopped from asserting that the parties could not be bound absent a written, signed settlement agreement because she "should have raised the objection earlier and [her] failure to do so warrant[ed] the application of judicial estoppel."  (AA486.)  Despite the false representation made by Lamb to the Minnesota bankrupt-cy court and despite Wasserstrom's failure to inform the Florida bankruptcy court that there was an objection to the settlement by Ashton, the bankruptcy court held that Ashton's failure "to ob-ject to the representation that the parties reached a settlement . . . effectively persuaded" both bankruptcy courts "to accept the representation that the parties reached a settlement."  (AA487.)

This holding is clear error for two reasons.  First, the bankruptcy court totally misunder-stood the doctrine of judicial estoppel, under which "a party is precluded from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceed-ing."  *In re Mouttet*, 493 B.R. 640, 666 (Bankr. S.D. Fla. 2013).  In the Eleventh Circuit, two fac-tors must be met for establishing the bar of judicial estoppel.  "'First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding.  Second, such in-consistencies must be shown to have been calculated to make a mockery of the judicial system.'"  *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002)).  Neither element exists here: Ashton did not take any position under oath that contradicts her position that no enforceable settlement agreement

---

[3]  The Trustee may argue that Ashton failed to object to the bankruptcy court's jurisdiction within the time period set forth in the **Initial Pretrial Order**.  But the court had no jurisdiction to enter the **Initial Pretrial Order**.  Moreover, while the deadline to object to the bankruptcy court's jurisdiction pursuant to the **Initial Pretrial Order** was 10 days prior to the date first set for the pretrial conference (AA14), which was set for August 21, 2012, the bankruptcy court's August 2, 2012 order extended the date for the pretrial conference and suspended all deadlines set forth in the **Initial Pretrial Order**, unless otherwise ordered by the court (AA52).  Accordingly, Ashton's objection is timely.

exists. Thus, the bankruptcy court could not identify a single document executed by Ashton under oath in which she allegedly asserted a contradictory position. Instead, the bankruptcy court erroneously concluded that Ashton's counsel's failure to take action in response to certain filings justified application of judicial estoppel. Since Ashton asserted no inconsistencies, mockery of the judicial process is not implicated. Thus, the bankruptcy court erred as a matter of law in its holding.

Second, the bankruptcy court made a clearly erroneous factual finding. The bankruptcy court relied on Ashton's failure to (i) object to the MN Rule 9019 Motion, (ii) seek relief from the MN Rule 9019 Motion, (iii) object to the characterization of the case as settled on the Status Report, and (iv) seek relief from the Dismissal Order as the basis for concluding that judicial estoppel applied. (AA485-486.) The indisputable evidence, however, was that Ashton had no knowledge of the MN Rule 9019 Motion or the order approving it until after Trustee filed the FL Rule 9019 Motion. (AA378:16-379:1.) Therefore, she could not possibly have objected to them. Similarly, Ashton's failure to object to the characterization of her case as settled on the Status Report is of no import because both Appleby and Farfante testified, without contradiction by Wasserstrom, that Wasserstrom had advised them that the pretrial hearing would simply be carried without substantive arguments relating to any specific adversary proceeding. (AA153a, 178, 180, 350:22-351:5, 761.) Lastly, Ashton's failure to object to the Dismissal Order does not support the application of judicial estoppel because Ashton understood, based on Farfante's exchanges with Wasserstrom, that she had 30 days from entry of the Dismissal Order to finalize the terms of the settlement. (AA375:4-24.) For that reason, no application seeking relief from the Dismissal Order was filed. When the Trustee filed the FL Rule 9019 Motion to enforce the Oral Settlement, Ashton timely objected that no enforceable settlement exists.

Accordingly, the bankruptcy court's decision must be reversed.

### III.   The Bankruptcy Court Erred in Holding That the MCMA Does Not Require a Mediated Settlement Agreement to be in Writing Signed by the Parties

      The Mediation Agreement explicitly incorporated the MCMA, which requires that a "mediated settlement agreement" be in writing.  In fact, the MCMA defines a "mediated settlement agreement" as "a **written agreement** setting out the terms of a partial or complete settlement of a controversy identified in an agreement to mediate, signed by the parties and dated."  Minn. Stat. § 572.33(4) (emphasis added); *accord* 1 ALT. DISP. RESOL. § 5:33 (3d ed.) (recognizing Minnesota as one of the jurisdictions that requires that agreements settling pending litigation under the MCMA be in writing).  The Mediation Agreement also explicitly incorporated the MCMA's requirement that "a written mediated settlement agreement is not binding unless it contains provisions that it is binding." (AA765.)  Compliance with the provisions of the MCMA is strictly enforced.  *See Haghighi v. Russian-American Broadcasting Co.*, 577 N.W.2d 927 (Minn. Sup. Ct. 1998) (declining to enforce a handwritten, signed mediation agreement because it did not state that it was a binding agreement).

      Despite the fact that the MCMA defines a mediated settlement agreement as a "written agreement," the bankruptcy court held that an oral settlement agreement is enforceable, relying solely on an unpublished decision in *Vo v. Honeywell, Inc.*, 1998 WL 15909 (Minn. Ct. App. Jan. 20, 1998), which is demonstrably not good law.  The *Vo* court relied on *Haghighi v. Russian American Broadcasting Co.,* 945 F. Supp. 1233 (D. Minn. 1996), **which was reversed** by the Minnesota Supreme Court, approximately four months after *Vo* was decided.

      In *Vo*, the Minnesota Court of Appeals upheld an oral settlement agreement that did not comply with the MCMA's requirements that it be in writing and held that it was binding because both parties were represented by counsel and were aware of the settlement's binding effect.  In reaching that conclusion, the *Vo* court relied exclusively on the district court's holding in

*Haghighi* that non-compliance with certain provisions of the MCMA may be excused where "'where both parties are represented by counsel and are fully aware of the binding effect of a settlement agreement[.]'" 1998 WL 15909, at *2 (quoting *Haghighi*, 945 F. Supp. at 1234-1235). Four months after the court's decision in *Vo*, however, the Minnesota Supreme Court reversed the precise holding in *Haghighi* on which *Vo* relied. *See Haghighi*, 577 N.W.2d at 929 (rejecting the district court's holding that non-compliance with the provisions of the MCMA can be disregarded where both parties are represented by counsel and are fully aware of the binding effect of a settlement agreement). Accordingly, the bankruptcy court conclusion must be reversed.

The bankruptcy court was bound by *Schwartz v. Adamson*, 1999 WL 170676, *2 (Minn. Ct. App. March 30, 1999), where the court dismissed the argument that an oral agreement should be enforced under principles of contract law and rejected reliance on the district court's decision in *Haghighi* in light of the Minnesota Supreme Court's reversal of the district court's decision. *Id.* The *Schwartz* decision is well-reasoned, consistent with the plain language of the MCMA, consistent with the holding of the Minnesota Supreme Court, and furthers the important policy of preventing additional litigation over the terms of oral settlements. The bankruptcy court had no power to ignore controlling Minnesota law. Its refusal to follow *Schwartz*, based on its finding that the *Schwartz* court "overreached," (AA492, n.17) is insupportable.

**IV.     Even if Oral Settlements Are Enforceable Under the MCMA, the Bankruptcy Court Erred in Enforcing the Oral Settlement**

Viewed under the traditional principles of contract law, the Oral Settlement is unenforceable because the evidence proves that the parties did not intend to be bound until there was an executed written agreement. *See Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925, 927 (Minn. Ct. App. 1992) (citing *Northway v. Whiting*, 436 N.W.2d 796, 799 (Minn. Ct. App. 1989)). Under Minnesota law, "where the parties know that the execution of a written contract [is] a condi-

tion precedent to their being bound, there can be no binding contract until the agreement [is] executed." *Dataserv Equipment v. Technology Finance Leasing Corp.*, 364 N.W.2d 838, 841 (Minn. Ct. App. 1985) (citing *Staley Manufacturing Co. v. Northern Cooperatives, Inc.*, 168 F.2d 892 (8th Cir. 1948)); *see also Regions Treatment Center, LLC v. New Stream Real Estate, LLC*, 2013 WL 4028148 (D. Minn. Aug. 7, 2013).

The bankruptcy court erred as a matter of law in holding that, since neither Ashton nor the Trustee objectively stated that an executed written contract was a condition precedent to the settlement, the parties did not intend to be bound until execution of a written agreement. (AA505.)  An explicit assertion that the parties do not intend to be bound in the absence of a signed agreement is not necessary; objective evidence that the parties intended to be bound only upon execution is sufficient to establish that a written agreement is required.  *See Luigino's Inc. v. Societes des Produits Nestle S.A.*, 2005 WL 735919, *4 (D. Minn. March 30, 2005) (citing *Massee v. Gibbs*, 210 N.W. 872, 873 (Minn. Sup. Ct. 1926)).

The bankruptcy court ignored the fact that the Mediation Agreement itself is objective evidence of the parties' intent not to be bound until a written settlement agreement is executed. Ashton and Appleby both testified that they understood that the settlement reached at the mediation was subject to a written settlement agreement.  (AA157, 161-62, 371:23-372:9, 372:21-25, 373:4-10.)  Appleby testified that his belief was based on the fact that the Mediation Agreement itself specifically stated that no agreement would be binding unless it was signed by all parties. (AA157.)  The bankruptcy court failed to give weight to that testimony because it found that it is merely illustrative of Ashton's and Appleby's subjective and unmanifested intent, which is irrelevant.  (AA507-508.)  That was an error.  The MCMA Provision explicitly set forth in the Mediation Agreement, which the parties signed and agreed to be bound by, is an objective manifestation of Ashton's intent not be bound until a written settlement is executed.  Compounding its

errors of misinterpreting applicable law and holding that a mediated settlement agreement under the MCMA does not need to be in writing to be enforceable, the bankruptcy court erred in finding that the parties intended to be bound, absent a writing. It is only by ignoring the MCMA Provision that the bankruptcy court could conclude that the Trustee, Rosen and Lamb did not know of Ashton's intent to be bound only upon execution of a written agreement.

In similar factual circumstances, where documents in connection with a transaction evidenced an objective intent not to be bound until the execution of a written agreement, courts have correctly declined to enforce an alleged settlement agreement in absence of an executed written agreement. For instance in *Hansen v. Phillips Beverage Co.*, the court held that no contract was formed where the letter of intent stated that "the letter 'shall not be a binding legal agreement, and neither party shall have any liability to the other until the execution of the definite purchase agreement.'" 487 N.W.2d at 927. Similarly in *Horace Mann Ins. Co. v. Ferguson*, the court held that no valid settlement agreement existed where one of the emails on which the party relied as the purported agreement contained an explicit disclaimer that a written executed agreement was required: "'[c]ontract formation in this matter shall occur only with manually-affixed original signatures on original documents.'" 2008 WL 2246142, *3 (Minn. Ct. App. June 3, 2008). In accordance with *Hansen* and *Horace Mann Ins. Co.*, the bankruptcy court should have found that no enforceable settlement was formed here in light of the MCMA Provision in the Mediation Agreement that requires a written settlement agreement.

The bankruptcy court committed error when it accepted the patently incredible testimony of Rosen and Lamb that they did not think that an agreement reached at mediation needed to be reduced to writing to be enforceable. (AA505.) "Whether a contract arose depends on an objective evaluation of the parties' actions and words, not on the parties' subjective intent." *Moga v. Shorewater Advisors, LLC,* 2009 WL 982237, *4 (Minn. Ct. App. Apr. 14, 2009). Rosen and

Lamb, as beneficiaries of a contingent fee agreement, obviously would have said anything necessary for their firms to realize the contingent fees they hoped to earn. That is precisely why the law requires a writing to enforce a purported settlement. The bankruptcy court erred as a matter of law in ignoring the MCMA Provision and the indisputable testimony of Appleby and Ashton that there could not be a binding agreement absent a signed written settlement agreement.

In its effort to reach a conclusion that would enrich counsel for the Trustees, the bankruptcy court ignored the following evidence that all parties understood a written settlement agreement was required:

❖ Wasserstrom emailed Appleby the Draft Agreement on August 22, 2012 – the day after the mediation. (AA54.)

❖ Wasserstrom confirmed in her conversations with Appleby after the mediation that the settlement would be binding only after a written agreement executed by the parties was approved by the Minnesota bankruptcy court and the South District of Florida bankruptcy court. (AA164-165.)

❖ Lamb, in seeking approval of the Ashton settlement agreement from the Minnesota bankruptcy court, made a false representation to the court that Ashton had entered into a written stipulation of settlement. (AA295:9-297:24.)

❖ In other cases where Appleby represented the defendants, the Trustee had refused to recognize as binding oral agreements reached at mediations. (AA157-158.)

❖ The Trustee waited five full months after receiving Appleby's initial comments on the Draft Agreement before moving to enforce the oral agreement.

All of this evidence proves that the parties understood that any agreement reached at the mediation would not be binding until it was incorporated into a signed settlement agreement.

Accordingly, the bankruptcy court's factual findings to the contrary are insupportable.

**V.      The Bankruptcy Court Erred in Holding that Appleby and Farfante Could Bind Ashton to a Settlement to Which She Did Not Agree**

An attorney cannot bind a client without authorization to do so.  *See Barry v. Barry*, 172 F.3d 1011, 1015 (8th Cir. 1999) (citing *Schumann v. Northtown Ins. Agency, Inc.*, 452 N.W.2d 482, 484 (Minn. Ct. App. 1990) ("Under Minnesota law, settlement of a client's claim is not sub-sumed within the ordinary agency of an attorney for his clients, so an attorney must be specifical-ly authorized to settle a claim.")).  The rationale behind this stringent requirement is that "settle-ments forced or not agreed serve to deprive a litigant of due process and his proper day in court." *State Dept. of Transp. v. Plunske*, 267 So.2d 337, 339 (Fla. 4th DCA 1972) (citation omitted).

Therefore, an unauthorized settlement may be enforced only if the client ratifies the set-tlement.  *See Gran v. City of St. Paul*, 274 Minn. 220, 223 (Minn. Sup. Ct. 1966) ("[A]n unau-thorized compromise of an action by an attorney may be ratified, either impliedly or expressly, by the client, who is thereafter bound by it despite the initial defect.") (footnote omitted)).  "In general, there is no ratification or implied assent on the part of the client where, upon obtaining knowledge of the unauthorized act of the attorney, the client promptly repudiates such act."  7A C.J.S. ATTORNEY & CLIENT § 230 (footnote omitted).

Notwithstanding its recognition that Appleby had no actual authority to settle on Ashton's behalf (AA503), the bankruptcy court held that Appleby's and Farfante's email exchanges with Wasserstrom bound Ashton under Minn. Stat. § 481.08.  (AA500-501.)  That statute binds a cli-ent to a settlement irrespective of any showing of authority **if an attorney had made an agree-ment to settle in open court or in writing and signed that agreement**.  Here, it is indisputable that there was no written agreement signed by Appleby or Farfante and that there was no agree-ment entered into in open court.  Hence, the bankruptcy court's finding was error.

Similarly, the bankruptcy court misapplied the law and misconstrued the facts when it analogized this case to *Schumann v. Northtown Ins. Agency, Inc*., 452 N.W.2d 482 (Minn. Ct. App. 1990), and held that the Oral Settlement is enforceable under the principles of implied acceptance and estoppel.  While *Schumann* stands for the proposition that settlement agreements entered into by attorneys are binding on the attorney's client where the client ratifies the settlement, *Schulmann* is distinguishable.  The *Schulmann* court held that the objecting parties were equitably estopped from denying the existence of the settlement where they, despite knowing of their attorney's acceptance of the settlement, delayed objecting to it until several months after and only upon new counsel's advice that the settlement was disadvantageous.  The court emphasized that "[a] party who voluntarily enters into a settlement agreement cannot avoid the agreement upon determining after consultation with replacement counsel that the agreement has ultimately become disadvantageous or the settlement amount paltry."  *Id.* at 485.

Those facts are not present here.  The bankruptcy court's holding that Ashton ratified the settlement was based on its erroneous finding that Ashton waited over four months after the settlement was reached, and only after she retained new counsel, to communicate to the Trustee's counsel that she refused to proceed with the settlement.  (AA503.)  That is factually incorrect. The undisputed evidence showed that, as soon as Ashton received the Draft Agreement, she notified Appleby that it did not provide her with "global" release for which she bargained. (AA363:23-364:2, 364:11-23).  Although Wasserstrom testified that she was not informed by Appleby of Ashton's refusal to proceed with the settlement, it is undisputed that Ashton asked Appleby on several occasions to communicate that to Wasserstrom and to obtain an indemnification provision to protect her from any further lawsuits in connection with the MetroGem loans. (AA366:23-367:4.)  It is also undisputed that Wasserstrom waited four months after October 12, 2012, when Ashton first saw the Draft Agreement, to seek to enforce the purported settlement.

Therefore, unlike *Schulmann,* Ashton immediately took action to repudiate the settlement and, according to Appleby, he communicated that to Wasserstrom.  Therefore, *Schumann* is inapposite and the bankruptcy court's reliance on it was an error.

## VI. The Bankruptcy Court Erred in Holding that Ashton's Understanding of the Scope of the Release Was a Unilateral Mistake that Does Not Justify Rescission of the Oral Agreement

The bankruptcy court held that Ashton made a unilateral mistake regarding the scope of the release and that such a mistake does not warrant rescission of the Oral ment.  (AA512.)  The court's conclusion was based on several errors.  The court ignored the fact that the Mediation Agreement required a written agreement signed the parties.  The court ignored the fact that the Trustee had consistently taken the position that oral settlements are not binding until confirmed by a writing signed by the parties.  (AA157:10-158:2.)  The court ignored the fact that counsel for the Trustees did not inform Ashton that, in their view, there was no requirement for a writing.  (AA319:2-5.)  And, in fact, the Trustee's production of the Draft Agreement proves that the Trustee understood a writing was required.

The bankruptcy court also erred in finding that Ashton should bear the risk of her mistake and that she should have been aware that she possessed insufficient knowledge and sought clarification.  (AA511-512.)  Ashton had no reason to seek a clarification because she reasonably relied on the inclusion of the MCMA Provision in the Mediation Agreement and she reasonably relied on her counsel's advice to her that the settlement was not binding until it was in writing.  (AA372:21-25.)

## CONCLUSION

For the foregoing reasons, Ashton respectfully requests that this Court enter an Order reversing the Decision and setting aside the FL Rule 9019 Order as moot.

## REQUEST FOR ORAL ARGUMENT

Ashton hereby requests oral argument pursuant to S.D. Fla. L. R. 87.4(f) due to the complexity of the bankruptcy issues involved.

Dated:  July 1, 2014

By:   _/s/ Lisa M. Castellano_

Lisa M. Castellano
Florida Bar No. 748447
BECKER & POLIAKOFF, P.A.
311 Park Place, Suite 250
Clearwater, Florida 33759
Telephone: (727) 712-4000
Facsimile: (727) 796-1484

By:   _/s/ Helen Davis Chaitman_

Helen Davis Chaitman
BECKER & POLIAKOFF LLP
45 Broadway, 8th Floor
New York, New York 10006
Telephone: (212) 599-3322
Facsimile: (212) 557-0295
_Attorneys for Marie Ashton and the Ashton Revocable Living Trust_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2014, a true and correct copy of the foregoing Initial Brief of Appellants and Appellants' Appendix (Volumes 1-4) were served via the Courts CM/ECF on all the parties in this action who receive electronic service through CM/ECF.  I certify under penalty of perjury that the foregoing is true and correct.


Dated:  July 1, 2014

By:     */s/ Lisa M. Castellano*
Lisa M. Castellano
Florida Bar No. 748447
BECKER & POLIAKOFF, P.A.
311 Park Place, Suite 250
Clearwater, Florida 33759
Telephone: (727) 712-4000
Facsimile: (727) 796-1484


By:     */s/ Helen Davis Chaitman*
Helen Davis Chaitman
BECKER & POLIAKOFF LLP
45 Broadway, 8th Floor
New York, New York 10006
Telephone: (212) 599-3322
Facsimile: (212) 557-0295
*Attorneys for Marie Ashton and the Ashton Revocable Living Trust*

{N0050384 2 }                               28